THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
PAUL SHAVER, Defendant-Appellant.

Second District   No. 78-57

Opinion filed November 1, 1979.

Mary Robinson, of State Appellate Defender's Office, of Elgin, for appellant.

Gene Armentrout, State's Attorney, of Geneva (Phyllis J. Perko and Jan Tuckerman, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

The defendant, Paul Shaver, was convicted of armed robbery after a bench trial and was sentenced to 5-10 years imprisonment. He appeals, contending that the trial judge committed reversible error in denying his motion to suppress physical evidence and identification testimony.

The defendant was charged with the armed robbery of the Foremost Liquor Store in Aurora on April 15, 1977. Sergeant Thomas Herlihy of the Aurora police testified at the suppression hearing that on April 16, 1977, he saw a black 1966 Pontiac in the parking lot of Hansen's Motel. The description of the car and its license number had been provided by a witness at the scene of a burglary. Herlihy inquired from the manager and secured the room number of the motel guest associated with the Pontiac. He removed the car keys which had been left in the trunk lock. When other officers arrived, Herlihy and four other police officers knocked on the door of the designated motel room. The defendant opened the door. Herlihy testified that he told Shaver that he was going to tow the car and hold it for one Dave Dettore in Ottawa who had reported the car missing. He said that Shaver answered "Okay." Herlihy said he asked him for permission to look into his car and that defendant answered that it wasn't his car and that he should ask the owner.

The officer asked defendant whether anyone else was in the room and received a "no" answer. However, the officers noticed a closed bathroom door and found a David Kimes, whom they placed under arrest in connection with the charge of burglary which they were investigating. After Kimes was arrested Shaver said he was going out to the car and get his clothes if they were going to tow it and walked out. He returned and asked who had the keys to the car. Herlihy testified that he said that he had the keys. Herlihy picked up the mattress and found a revolver which he took with him. At that point Shaver was outside the room.

After the officers took Kimes out Herlihy said he proceeded outside and went back to the car with Shaver; that Shaver went to the driver's side, took out a pair of pants and a leather jacket, said he had some more clothes in the trunk of the car and told the officer to open the trunk. Herlihy said he opened the trunk and saw another leather jacket lying in the trunk. At that point the officer told Shaver to put the clothes he had in the trunk, closed the trunk and told the defendant that they "would like to talk to him at the police station". Herlihy said that defendant responded again "Okay." Shaver was not placed under arrest at any time.

The officer further testified that he turned Shaver over to two other

officers and that defendant was transported to the police station in the back of a locked police van, inasmuch as the squad cars were not manned by two men, which police regulations required if persons were to be transported. Herlihy testified that when defendant was taken to the station he spoke to him and read his *Miranda* warnings. The defendant said he wanted to talk to his lawyer. Herlihy then asked defendant if he would give the police a photograph and testified that he said "Okay." His photograph was taken and the defendant was told he could leave and did so.

Herlihy testified that when he saw both Kimes and defendant at the motel they fit the description of the persons involved in the armed robbery and were both under suspicion for that crime. He also testified that the jacket which was seen in the trunk was an item that was described in the description of the armed robbers.

There was no further testimony, and the court denied the motion to suppress the gun and the clothing. At a further hearing to suppress the out-of-court photo identification resulting from the photograph taken in the police station, Officer Gatske testified that he conducted a photographic lineup on April 16, 1977, using the picture of Paul Shaver obtained earlier in the day from Sergeant Herlihy. The victim, Robert Bellon, also testified that on April 16 he was shown a group of photographs and chose defendant's picture. Gatske testified that he did not point out any photograph to Mr. Bellon and that the names and numbers on the photographs used in the examination were covered up showing only the side and front view of the men. The court denied defendant's motion to suppress the identification testimony of Bellon, finding that the photograph was obtained with defendant's cooperation and voluntary consent.

In the bench trial Bellon described the armed robbery at the liquor store where he was employed. He identified the defendant as the armed robber and testified that the gun and jacket exhibited by the People were similar to the gun used and the jacket worn by the robber. Bellon testified that the man he saw in the liquor store had a full beard and moustache and confirmed that the pictures taken of Shaver on April 16 contained a full beard and moustache. Bellon also testified that he had given the officers a description of the man as having fairly long hair with a full beard. At the trial defendant was without the beard.

On cross-examination, Bellon stated that the robber wore sun glasses that were darkly tinted and mostly covered the man's eyebrows. He was shown the photograph that Bellon had earlier identified as being the defendant. Bellon testified that without the beard and sun glasses he might not have recognized Shaver immediately, but positively identified defendant in court as the man that robbed him because of his hair and his

"build." He said that he was across the counter from the armed robber when he came in and ordered a package of cigarettes. He recalled and testified to the threatening language which the man used when he told Bellon he wanted all the money in the register. Sergeant Herlihy testified at the bench trial to substantially the same effect as he had in the suppression hearing.

The defense offered no witnesses with the exception of calling the investigating officer who was asked to look in the defendant's mouth and who testified that there were no teeth on his upper gums.

In holding defendant guilty at the close of the evidence the trial judge made several findings. He first found that there was no evidence that the photo identification lineup was suggestive. He also found that there was sufficient opportunity at the time of the occurrence to establish an independent in-court identification. He concluded that more than the face was involved in the identification and that there was no evidence that he exhibited any unusual condition in regard to his mouth or his teeth at the time of the crime. He found and considered the gun and the jacket to be merely circumstantial evidence.

The most significant issue in our view is whether the photograph of defendant was obtained with his uncoerced consent; or, if not, whether it so tainted the in-court identification that defendant was deprived of a fair trial.

The defendant contends that under all the circumstances he would reasonably assume that he had no choice but to comply with the police request to be photographed. It is of course true that defendant was accompanied by police throughout, and that he was transported to the station in the back of a locked police van. There was also testimony by the motel manager that defendant was handcuffed when he left the motel. The officers could not recollect whether he was handcuffed when they saw him in the van. There was also no evidence that defendant was advised that he had a right to refuse to go with the police to the station for interrogation.

The fact that defendant was not formally placed under arrest before his appearance at the police station and his consent to being photographed is not of great significance. "[D]etention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." (*Dunaway v. New York* (1979), ___ U.S. ___, ___, 60 L. Ed. 2d 824, 838, 99 S. Ct. 2248, 2258.) In *Dunaway*, the petitioner was brought into police headquarters involuntarily for questioning despite the fact that the police did not have enough information for an arrest warrant, was not told he was under arrest, was placed in an investigation room, given *Miranda* warnings,

questioned and, waiving counsel, inculpated himself. Here, the defendant agreed to come with the officers to the station so they could talk with him and he consented to being photographed. His essential claim is that his consent was not real but made under at least implicit compulsion.

■■ The question whether a consent is voluntarily given or coerced is ordinarily one of fact to be resolved by the trial court in the first instance. (*People v. Zynda* (1977), 53 Ill. App. 3d 794, 801.) The consent must be proved by clear and positive testimony which establishes that there was no duress or coercion, actual or implied; the consent must be shown to be unequivocal and specific with every reasonable presumption being indulged against waiver of fundamental constitutional rights. (*People v. Haskell* (1968), 41 Ill. 2d 25, 31.) The failure to show that the consenting party was advised of applicable constitutional rights is at least a factor bearing on the understanding nature of the consent. (41 Ill. 2d 21, 31. See also *People v. Kincaid* (1977), 51 Ill. App. 3d 975, 979.) It follows that where *Miranda* warnings have been given prior to the consent to search this is a factor which tends to show voluntariness. *People v. DeMorrow* (1974), 59 Ill. 2d 352, 361.

■■ Defendant Shaver did not show any resistance to the request of the police. The only explicit assertion of his rights was his refusal at the station to give a statement and his request for a lawyer, which the police honored. Thereafter, defendant made no objection to the request that he be photographed before leaving the station. All of this occurred, of course, after he had been given his *Miranda* warnings which it would appear he well understood. While the initial request to come to the station "may easily carry an implication of an obligation * * * unless clearly stated to be voluntary" (*Dunaway v. New York*, ___ U.S. ___, ___ n. 6, 60 L. Ed. 2d 824, 832 n. 6, 99 S. Ct. 2248, 2253 n. 6), no court has held that this fact by itself makes it impossible for a suspect to voluntarily consent to accompany police to the station for interrogation. The defendant has, in fact, conceded in oral argument that his initial favorable response to the police request to go to the station was voluntary, but has maintained that being handcuffed and transported in a locked police van together with the surroundings at the station created a coercive atmosphere which invalidated his consent. We agree, and hold that the photograph and the testimony related to it should have been excluded.

■ The fact that the photograph was unlawfully obtained, however, requires the further inquiry into whether the in-court identification must also be suppressed as a "fruit of the poisonous tree." We hold that the in-court identification was independently admissible and that the admission of the photographic evidence was harmless error under the facts.

Courts "have been virtually unanimous in holding that an illegal arrest does not render inadmissible identification testimony resulting from

the subsequent lineup or photographic identification." *State v. Lynch* (Mo. App. 1975), 528 S.W.2d 454, 459.

Courts have firmly established that the rationale behind the fruits of the poisonous tree doctrine is deterrence of police misconduct. The archetypal case for invocation of the doctrine is *Davis v. Mississippi* (1969), 394 U.S. 721, 22 L. Ed. 2d 676, 89 S. Ct. 1394 (police dragnet), or *United States v. Edmons* (2d Cir. 1970), 432 F.2d 577, where defendants were arrested solely as a pretext to show them to victims in the hopes of getting an identification. If the police here went out looking for Shaver to pick him up *solely* to get his photograph, the doctrine would apply. But the record shows that the police stumbled upon Shaver while investigating another crime. It is not certain why they detained him, yet the circumstances, although clearly less than probable cause to arrest, were quite suspicious, and he was found with a burglary suspect. It seems very doubtful he was taken to the station *solely* to obtain his photo. Photographing suspects is standard police procedure. Furthermore, it seems likely that somewhere his photo could have been located since he had a prior criminal record. "Exclusion of evidence best deters unlawful arrests when a causal relationship between the evidence excluded and the purpose of the arrest (or detention) is shown." (69 Yale L. J. 432, 435-36 (1960).) The causal relationship has not been demonstrated here. *Cf. People v. Pearson* (1978), 67 Ill. App. 3d 300.

In a leading case, *People v. McInnis* (1972), 6 Cal. 3d 821, 494 P.2d 690, 100 Cal. Rptr. 618, the California Supreme Court faced very similar facts. There the victim of a liquor store holdup could not positively identify his assailant after viewing hundreds of photographs. The defendant was illegally arrested on another charge about a month after the holdup by a different police department and was photographed. Four days later his photograph was shown to the victim who identified him. Defendant was convicted and the victim relied on both the on-scene and the photographic identifications in making his in-court identification. The court held that the in-court identification was not the fruit of the poisonous tree for several reasons. First, the court noted that the illegal arrest was unrelated to the crime for which defendant was eventually convicted. Second, it noted that different State agencies were involved, that is different police departments, so that there was not a causal relationship between the arrest and the in-court identification. Thirdly, it applied the doctrine of *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407, and held that there was not an "exploitation" of the illegal arrest, since the defendant was not arrested *in order to* show his photograph to the victims. In *People v. Pettis* (1973), 12 Ill. App. 3d 123, defendant was illegally arrested and while in custody his photograph was taken. Subsequently his photograph was shown to the victim of an

armed robbery who identified him as the assailant. The defendant argued that but for his illegal arrest, his photograph would not have been taken by the police and shown to the witnesses, and that without that identification he would not have been arrested a second time. The court noted that "whether a 'booking' photograph transmits such a taint is a novel question in this state" (*Pettis*, at 124), and ruled that the identification testimony was not the fruit of the poisonous tree. The court reasoned that if the arrest was solely in order to obtain the photograph it may have suppressed any identification testimony in the case. (*Pettis*, at 128.) However, the court decided that that was not the case, and due to the lack of a causal relationship, that is, an exploitation of the illegal arrest, the later identification testimony need not be suppressed. We find *Pettis* persuasive. See also *People v. Ross* (1978), 60 Ill. App. 3d 857, 863; *People v. Washington* (1978), 60 Ill. App. 3d 662; *People v. Faulisi* (1977), 51 Ill. App. 3d 529.

Not only was there lack of "exploitation of the unlawful arrest" under *Wong Sun*, but it is quite certain that Shaver would have been identified anyway. The inevitable discovery rule has been stated: "If the court finds that the investigation would have occurred in the absence of the illegality, and would have proceeded in a manner that would have led to the discovery of the evidence, the challenged evidence will frequently be admitted." (74 Colum. L. Rev. 88, 93-94 (1974).) It seems from the record that once defendant was found by the police in a suspicious situation, they would have further investigated his connection to the robbery. Defendant could have been viewed by the victim without illegal detention. (*United States v. Young* (4th Cir. 1975), 512 F.2d 321; see also *United States v. Quarles* (4th Cir. 1967), 387 F.2d 551.) Therefore, a proper investigation could have discovered evidence which resulted in defendant's lawful arrest. It is safe to conclude: "The appellant would not have remained unidentified 'but for' the photograph taken." *Johnson v. State* (Tex. Crim. App. 1973), 496 S.W.2d 72, 74.

We also conclude that the in-court identification was not tainted by the photographic procedure and was sufficient to sustain the conviction. The holdup victim had ample opportunity to view the robber at the time of the crime. He testified that he was looking at the robber during the crime, and was separated from him only by the width of a store counter. He exhibited a high degree of attention to the robber's characteristics as evidenced by the description given to the police officer which was consistent with that of the defendant. The in-court identification was positive and unequivocal. These circumstances assure reliability. *Cf. Manson v. Brathwaite* (1977), 432 U.S. 98, 114, 53 L. Ed. 2d 140, 154, 97 S. Ct. 2243, 2253. See also *People v. Triplett* (1970), 46 Ill. 2d 109, 114; *People v. McDonald* (1974), 23 Ill. App. 3d 86, 93.

■■ The defendant has also contended that the seizure of defendant's jacket from the car was reversible error. We do not so find. We do agree that the jacket was seized without the defendant's consent, and that the seizure was not justified on the basis that the officers had probable cause to believe that it was connected with the robbery or evidence of the crime of burglary which the officers were investigating. However, the victim merely testified that the jacket was "similar" to the one worn by the robber; and the substance of his identification testimony showed reliance on defendant's physical characteristics; and the judge gave the evidence only passing attention as "only circumstantial evidence" which "the court can consider," basing his finding of guilt mainly on the eyewitness' identification. The evidence therefore was harmless beyond a reasonable doubt particularly in view of the fact that, in any event, it was of little probative value as evidence of defendant's guilt.

We affirm the judgment.

Affirmed.

GUILD, P. J., and LINDBERG, J., concur.