THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ARTHUR J. TAGGART, Defendant-Appellant.

Second District   No. 2—89—0392

Opinion filed September 3, 1992.—Rehearing denied October 7, 1992.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Marshall M. Stevens, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DOYLE delivered the opinion of the court:

Defendant, Arthur J. Taggart, was indicted in the circuit court of Du Page County on five counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14) and one count of child pornography (Ill. Rev. Stat. 1985, ch. 38, par. 11—20.1(a)(2)). Following a severance of the child pornography charge, defendant was tried by a jury and found guilty of all five aggravated criminal sexual assault counts. He was sentenced to 30 years in prison on the first four counts and received a consecutive sentence of 15 years on the fifth count.

On appeal, defendant raises the following issues: (1) whether the police had a sufficient basis to make the initial stop of his vehicle; (2) whether the police had a lawful basis to detain him to investigate possible sexual misconduct; (3) whether defendant's consent to search his van was the product of an unlawful detention when the police placed him in an interrogation room at the police station and questioned him; (4) whether his consent to search his van was involuntary because of the coercive atmosphere at the police station and the connection to the prior unlawful search of his van; (5) whether there was a nexus between the items seized from his van pursuant to the consent search and criminal conduct sufficient to support the seizure; (6) whether the trial court erred in permitting the prosecution to introduce in rebuttal two books which had been suppressed as having been illegally seized; (7) whether the trial court erred in prohibiting standby counsel from prompting defendant to make objections; (8) whether defendant was denied his right to counsel when his appointed counsel, because of unidentified ethical concerns, refused to conduct a direct examination of defendant beyond asking his name and having him narrate; and (9) whether the trial court abused its discretion in determining the sentence.

The following facts are relevant to our disposition of the various issues raised on appeal. Officer Robert Nicholas of the Elmhurst police department testified at a suppression hearing that on February 6, 1987, he was on patrol in a marked squad car. At about 12:19 a.m. he received a radio dispatch of a suspicious, dark colored van in the northwest corner of a parking lot located at the North Avenue and Route 83 Plaza. As he entered the parking lot, he observed a dark

colored van matching the dispatched description sitting in the lot with no lights on. As he drove north past the van, he saw it start to move toward Route 83. As it moved toward Route 83, the van still had its lights off. Defendant denied on cross-examination that the van moved after the officer entered the lot.

Officer Nicholas drove behind the van and activated his spotlight but no other signal lights. Defendant testified that the mars lights were not activated. Nicholas stopped his squad car about 50 feet behind the van in a well-lighted area of the lot. The driver of the van, identified as defendant, exited the van and approached the squad car as Officer Nicholas approached the van. They met between the vehicles.

According to Officer Nicholas, he asked defendant for identification and explained to defendant that there had been a report of a suspicious automobile in the area and that defendant's van matched the description. Defendant testified that he removed his driver's license from his wallet as he approached Nicholas and handed him the license. Defendant explained to Nicholas that he was in the parking lot for the purpose of teaching another person how to drive. On cross-examination, Nicholas testified that after concluding defendant had a valid driver's license and vehicle registration he continued to question defendant to "make sure everything was kosher."

Officer Nicholas asked defendant to remain near the squad car. Nicholas then approached the van and had a brief conversation with the passenger who was now seated in the driver's seat. He asked the passenger, V.T., if he was learning how to drive, and V.T. said no. Nicholas returned to defendant, and defendant told him that he had been with V.T. earlier in the day and that they had gone to a movie. Defendant was in the area to celebrate V.T.'s birthday and thought he would like to teach V.T. how to drive.

Officer Nicholas then returned to V.T., who was now standing outside the driver's door of the van, and explained to him that defendant had said that he was teaching him how to drive. Nicholas ascertained V.T.'s birthday to be January 17, 1974. V.T. also stated that he and defendant were planning on staying at a friend's house in Addison although he could not give Nicholas a location or name.

Nicholas once again returned to defendant, who was still standing outside the squad car, and defendant explained that he and V.T. were going to sleep in the van at V.T.'s house that evening. According to Officer Nicholas, defendant was nervous, breathed rapidly, trembled slightly and had great difficulty removing his driver's license from his wallet.

After this last conversation, defendant indicated to Nicholas he was cold, and Nicholas asked him if he would like to have a seat in his squad car, to which defendant agreed. Defendant entered the rear of the squad car, and Nicholas turned the heat up. Defendant never requested to leave the squad car thereafter.

Another officer arrived during this time, and V.T. was placed in that officer's squad car. Nicholas then requested the police dispatcher to contact V.T.'s parents to see if they knew his whereabouts. Prior to receiving a response to his request, Nicholas looked in the already open driver's door of the van to determine whether V.T. had any clothes to stay overnight. Nicholas wanted to verify what he had been told by V.T. and defendant. He observed no clothing that would have belonged to V.T. He saw, on the center console, an envelope routinely used to hold photographs. The envelope was positioned on top of the console with the partially opened flap facing the passenger door of the van. Nicholas flipped open the cover and found a photograph of a naked male juvenile. Nicholas removed the envelope and photographs contained therein from the van.

After receiving a dispatch concerning a conversation with V.T.'s mother, Nicholas asked defendant if he would mind coming to the police station. During cross-examination, Nicholas stated that the dispatcher told him that V.T.'s parents had given V.T. permission to be with defendant. Nicholas also stated that he questioned this information and was a little skeptical. Nicholas at no time told defendant he was required to go to the police station. At that time, defendant asked Nicholas to secure the van. Nicholas removed the keys from the van and locked all its doors. Nicholas entered his squad car and returned the keys to defendant.

Nicholas then drove to the police station, arriving in about four to five minutes. Defendant did not ask to leave the squad car during the ride but did state that he had a heart problem and asked if it would be possible to obtain his medicine if he had a problem. Nicholas responded that the police would definitely get his medication if he had a problem.

Upon arriving at the police station, defendant was taken to an interview room, and V.T., who had been transported in a separate car, was taken to a separate interview room. Nicholas then contacted Detective Kenneth Carr. Nicholas wanted to discuss with Carr what he had "found on the street" and to explain the pictures found in the van.

Defendant offered a somewhat different version of the facts surrounding the stop. According to defendant, Nicholas said, "why don't

we get into the squad car." Nicholas opened the squad car door and motioned defendant in. Once defendant entered the car, Nicholas suggested that he scoot over and then slammed the door behind him. Defendant tried to open the rear passenger door and realized that the rear doors could not be opened from the inside.

According to defendant, a second squad car arrived and both Nicholas and the second officer entered his van and searched it for 35 to 40 minutes. One of the officers seized an envelope containing negatives. The officer held one of the negatives up to a parking lot light. One of the officers came back to the squad car and asked defendant what he was doing with all of the pictures of little naked boys. The officers carried away several items from the van, including sleeves of negatives. They also found a three- by five-inch file box kept in the bottom dresser drawer located in the van.

After searching the van, one of the officers told defendant that it was warmer at the station and that they were going to the station. Defendant asked to leave, but the officers did not answer and drove off. Defendant felt he had no choice but to go to the police station and considered himself in custody.

Officer Michael Campise testified that he was also on patrol at about 12:19 a.m. on February 6, 1987. He received a radio dispatch of a suspicious dark green van in the area of a used car lot located at the intersection of North Avenue and Route 83. Upon arriving at the parking lot at that location, Campise observed Officer Nicholas talking to a man outside a green van. At that point, Campise was stopped by the owner of a car lot located about 300 feet from where Nicholas had the van stopped. The owner told Campise that the green van and a brown Camaro had been driving through the car lot slowly. He was worried about the possibility of vehicles in his lot being burglarized as the owner of the Camaro was an unhappy former customer of his.

Campise then approached the van and spoke to the person sitting in the driver's seat. He identified him as V.T. and determined that he was 12 or 13 years old. He placed V.T. in the rear of his squad car. He then asked defendant, who was standing between the squad car and the van, what he was doing in the lot at that time. According to Campise, defendant explained that it was V.T.'s birthday and that they were out celebrating. Campise admitted on cross-examination that he did not state in his written report that defendant had said V.T.'s birthday was that day. Defendant further explained that he allowed V.T. to steer the van while V.T. sat on his lap. Defendant appeared nervous to Officer Campise. Campise then transported V.T. to the police station

pursuant to Officer Nicholas' request, arriving at approximately 12:50 a.m.

Campise admitted looking into the van through an open door but denied going through the van. He also testified that he did not observe Nicholas remove anything from the van.

Detective Kenneth Carr of the Elmhurst police department testified that at approximately 12:45 or 1 a.m. on February 6, 1987, he was called to the police station. He initially met with Officer Nicholas, who wanted him to assist in interviewing V.T. and defendant. Detective Carr could not recall the time he began to talk to defendant. He described the interview room as having a large panel of glass in the door and that the door was unlocked.

The initial conversation with defendant lasted about 15 or 20 minutes. He discussed defendant's having a young boy in his presence at such a late hour. He then asked defendant if they could look into his vehicle and see if there was anything there that might explain why he was out at that hour. Defendant responded that there was nothing in the van to incriminate him but that there were photographs and negatives that people might misconstrue. Defendant explained that there were camp photographs and camp literature.

Carr then showed defendant photographs of two young boys that he had obtained from Officer Nicholas and asked defendant to sign a preprinted consent form to search the van. Carr advised defendant that he did not have to allow the search but that it would help the police to clear up the matter. Carr read the form to defendant, and defendant stated that he wanted to be present during the search. Carr then wrote on the consent form that defendant desired to be present at the search. Carr completed the form, and defendant signed it. The consent form states that it was signed by defendant at 2 a.m.

Carr testified that he instructed defendant he was free to leave but that it would be helpful if he provided some information as to what was going on and what was in his van. He at no time told defendant that he could not leave unless he let the police go through his van. Defendant stated that he wished to obtain some medication from the van, and Carr told him the police would get it for him. Defendant exhibited no signs of illness while Carr spoke to him.

On cross-examination, Carr testified that he "mentioned" to defendant that he was free to go but admitted that he did not say directly that defendant was free to go. On re-cross-examination, he explained that he did tell defendant he was free to go but defendant wanted to stay and assist in clearing up the matter. Carr did not advise defendant of his *Miranda* rights. He remembered seeing defend-

ant's driver's license that evening but could not recall if he or someone else returned it to defendant. Carr denied telling defendant that if he signed the consent form he could have his heart medicine.

About 10 minutes after obtaining defendant's written consent, Carr, Campise, Nicholas and defendant returned to defendant's van. Defendant was transported and remained in Nicholas' squad car during the search. After the search, defendant was transported back to the police station and questioned further. He was also fingerprinted and photographed.

Defendant testified that he was placed in an interrogation room alone for about 10 or 15 minutes. One of the uniformed officers came in and questioned him about the negatives. Defendant was then introduced to Detective Carr and questioned further. When defendant asked if he could leave, the officers asked if he could afford a lawyer. On redirect, defendant stated that he did not say he wanted to leave, but rather, he asked when he could leave. According to defendant, he asked the officers for access to his heart medication and was ignored. When he asked for the medication again, the officer said, "oh sure; we know all about that."

According to defendant, Detective Carr and one of the uniformed officers said that defendant would be allowed to leave if they could go through the van. Defendant continued to ask for his medicine, and one of the officers told him that if he signed the consent form they would be able to get the medicine for him. Defendant finally agreed to sign the consent form after Carr agreed to let him be present at the search and to get his medicine.

Defendant testified he was then driven to his van in the backseat of a squad car. He was not allowed to get out of the car during the search. Defendant testified that after completing the search the police transported him back to the police station and locked him in the interrogation room. Defendant asked and was allowed to use the restroom. The police continued to question him, and at around 5 a.m. he was allowed to leave. He asked for his driver's license and was told that Detective Carr had locked it in a room and had left with the keys to the room. Defendant was told to return later in the day to pick it up.

Officer Nicholas testified that he parked his squad car in a position so defendant could view the search of the van. The headlights shined directly through the side door of the van, and it was possible to observe the inside of the van from the squad car. The officers obtained the keys from defendant, unlocked the van and searched it. The parties stipulated that the items seized during the consent search were three envelopes containing photographs, two index card files,

three notebooks containing pictures and negatives and a pamphlet for defendant's camp. All items were found in dresser drawers.

Ms. Kim Schillinger, a school social worker, testified for the State that on January 19, 1987, a student told her that he had previously attended a camp in Kentucky owned by "A.J." The student told her that T.B., one of the alleged victims in this case, had also attended the camp. Without elaboration, Ms. Schillinger testified that on January 30 she reported to the Department of Children and Family Services that she believed sexual abuse had occurred at the camp and that the camp was not legitimate. She gave DCFS the name of T.B. as being involved. On cross-examination, Schillinger testified that she did not report this information to any law enforcement authority. She did give the last name of "A.J." to DCFS when she made the written report on January 30.

V.T. testified that on February 6 he and defendant were sitting in defendant's van eating snacks when the police arrived. He and defendant had gone to the parking lot, and defendant had let him drive the van. According to V.T., defendant had come to the Chicago area to see V.T. and T.B. after V.T.'s birthday. V.T. did not recall seeing any photograph envelope or any photographs on the console of the van.

V.T.'s mother testified that she and her husband received a telephone call from the Elmhurst police department on February 6, 1987, between 12 a.m. and 12:30 a.m. advising them that V.T. was there. She and her husband went immediately to the police station. She was asked if defendant had permission to be with V.T. and answered yes.

The trial court suppressed the pictures initially seized by Officer Nicholas from the console of the van. The court ruled that there was no probable cause to support a search of the van at that point in time. The court further found that defendant voluntarily went to the police station and voluntarily consented to the search of his van. Furthermore, the court determined that defendant was in custody at the time he was returned to the police station following the consent search of his van. Finally, the court suppressed defendant's photographs and fingerprints taken at the police station prior to his being released. The court made no ruling as to any statements made by defendant as the court did not consider the motion to suppress evidence to have embraced the issue of statements.

On December 5, 1988, the trial court granted defendant's motion to suppress two paperback books entitled *Pre-Teen Sex* and *Games of Summer*, which had been seized from defendant's van on February 16, 1987, pursuant to a search warrant. The book *Pre-Teen Sex* con-

tains sexually explicit material consistent with its title, and *Games of Summer* discusses various homosexual encounters between older males and younger boys. Later, on January 12, 1989, the court ruled that the State could retain the books for possible rebuttal use.

On December 29, 1988, the trial court conducted a hearing on defendant's motion to suppress statements. For purposes of the suppression hearing, and pursuant to agreement between defendant and the State, the court took notice of Officer Nicholas' and Officer Campise's prior testimony at the earlier suppression hearing.

Detective Carr again testified at the December 29 suppression hearing that defendant was very cooperative and never voiced any objections to being at the police station. Carr did not threaten defendant and told him he was not in custody. Defendant never chose to remain silent, never asked to consult with an attorney and never asked to leave until after the police completed their questioning. Carr denied telling defendant that the police possessed hard evidence of his having committed certain offenses, denied telling defendant that the police would get help for him if he confessed, and denied telling him that he would be given his heart medication if he consented to a search of his van and confessed. According to Carr, defendant did not appear ill, did not appear under the influence of alcohol or drugs and was understandable. Carr spoke with defendant twice concerning his consent, once for about 15 to 20 minutes and later for approximately 5 to 10 minutes. Following the consent search on February 6, Carr again spoke with defendant for about 15 minutes. Carr again denied threatening defendant or making any promises.

On cross-examination, Carr admitted that he did not advise defendant, during any of his conversations with defendant on February 6, 1987, that he did not have to speak, that he could have an attorney present, that anything he said could be used against him or that if he could not afford an attorney one would be provided. He did tell defendant that he did not have to give his consent to search. He denied that defendant ever asked to leave or that the reason for defendant's consent to the search was his desire to get his heart medication.

Carr further testified that defendant came to the police station on February 16, 1987, pursuant to Carr's request. Carr had told defendant that he would discuss the return of his property. Carr and two other detectives interviewed defendant at the station. Some of the items were returned to defendant at that time. Defendant was asked but refused to give another consent to search his van. Carr could not

recall having any other conversations with defendant after February 16, 1987, pertaining to the investigation.

Carr further testified that he showed defendant two photographs initially seized from the console of defendant's van by Officer Nicholas which depicted two naked young males under a waterfall. He showed these photographs to defendant after he received his oral consent to search but before defendant signed the written consent form.

On January 14, 1988, the trial court granted defendant's motion to represent himself, discharged defense counsel and appointed the public defender as standby counsel. Thereafter, on January 29, 1988, another suppression hearing was held relating to the basis of the seizure of various items from defendant's van pursuant to the consent search on February 6, 1987. Detective Carr again testified at that hearing.

Carr identified various photocopies as being of photographic prints made from negatives seized as part of the consent search. The negatives were initially viewed by Officers Nicholas and Campise as they searched the van. As they looked at the negatives, these officers told Carr, who was outside the van, that they depicted nude little boys, which he interpreted to mean under the age of 18. They also told Carr that they showed the genital areas of several of the children. Carr then took the negatives to the station and examined them. Several depicted nude children with their penises and anuses exposed. Carr believed the age of the various children to be under 13. V.T. appeared in some of the pictures.

Carr also identified photocopies of various three- by five-inch index cards seized pursuant to the consent search. The various cards contained names and addresses including the parents of V.T. Carr believed the cards contained the names and addresses of the children depicted in the photographs. The original photographs and index cards were returned to defendant. Carr further testified that the police used the index cards in conducting a follow-up investigation to locate some of the children depicted in the negatives.

On cross-examination, defendant questioned Carr concerning his written report wherein Carr referred to certain photographs and negatives, both of which were seized from defendant's van pursuant to the consensual search. The report states that "[n]one of the photographs appear to be lewd or show any sexual poses. No other pornographic material, such as magazines or sexual aids, were found in the van."

On redirect, Carr explained that he relied on Officers Nicholas and Campise's observations of the negatives at the time he seized

them. He conducted a more thorough examination of them at the police station. Carr explained that the statement in his report that the photographs were not lewd referred to photographs and negatives that he did not consider lewd. However, he did consider the negatives he retained to depict lewd behavior.

The court ruled that the police had probable cause to seize the various negatives. Additionally, the court found that the index cards were either evidence of a crime or would reasonably lead to additional evidence of a crime.

On May 6, 1988, the court appointed the public defender to represent defendant. Defendant's new attorney filed a motion to suppress evidence seized during the search, a motion to exclude evidence and a motion to reopen the proofs on the issue of probable cause to seize certain items pursuant to the consent search.

On June 27, 1988, a hearing was held pursuant to the motion to reopen the proofs. Detective Carr testified on behalf of defendant. Again, Carr described the negatives as depicting nude children under the age of 14 or 15 years old. Carr conceded his written report stated that none of the photographs appeared to be lewd or showed any sexual poses, nor was there anything lewd, sexual or pornographic about the index file cards seized. Carr seized the file cards because he felt they were associated with the negatives.

On cross-examination, Carr explained that when he used the word "photographs" in his report he was not referring to the negatives. He admitted on redirect that when he made his report he was writing about the negatives and the photographs. The court again found there was probable cause to seize the various items from defendant's van and denied defendant's motion to suppress.

Prior to trial, the court allowed defendant to represent himself and appointed the public defender as standby counsel. The following trial testimony is relevant to this appeal. Officer Nicholas testified that in the past he had been assigned burglary calls in the area where he encountered defendant's van. He clarified that as defendant approached him after exiting his van defendant started to remove his wallet prior to his requesting identification. On cross-examination, he added that defendant had his driver's license in his hand at the time Nicholas asked for identification. According to Nicholas, defendant told him it was V.T.'s birthday that day and that he was there to celebrate it. When asked on cross-examination whether he signalled the van to stop, Nicholas answered that he put his spotlight on the van.

Detective Carr testified at trial that he explained to defendant that he was investigating the stop of the van and defendant re-

sponded that he was willing to assist and voluntarily cooperate. On redirect examination, Carr added that defendant was extremely cooperative, said he would stay as long as necessary and never asked to leave until the investigation was complete. As to the consent to search, defendant told Carr he would be happy to assist and cooperate because he wanted to conclude the matter before leaving the area. He further testified that the index file cards contained the names of T.B. and V.T. and appeared to be business records of defendant's camp.

Detective James Doherty of the Elmhurst police department testified that on February 16, 1987, he spoke with defendant at the police station. Defendant became quite upset when Doherty told him that certain boys who attended his camp would have to be interviewed. Defendant told or pleaded with Doherty three or four times not to interview the boys because it would ruin his reputation and put him out of business.

T.B., who was age 14 at the time of trial, testified that he first met defendant when T.B. was seven years old. He went to defendant's camp for boys in Kentucky approximately six or seven times. He and his friend also slept with defendant in defendant's van on three or four occasions in May 1986. According to T.B., defendant would take off his clothes and ask the two boys to do the same. Defendant would sleep between T.B. and V.T. On each of the occasions they stayed in the van, defendant placed his mouth on each of the boys' penises. Defendant also placed his mouth on T.B.'s penis while at defendant's camp.

T.B. also testified that on February 7, 1987, defendant and V.T. came by his residence, and defendant told him and V.T. that they should not tell about what defendant did to them or defendant would go to jail and they would get in trouble. According to T.B., he never told anyone about defendant's conduct prior to telling his mother during the investigation because he was afraid and did not want to get defendant in trouble. T.B.'s mother also testified that, following a conversation with officers investigating defendant's contact with her son, he told her that defendant put his mouth on his penis and hurt him. T.B. was crying and very hysterical when reporting this to her.

V.T., age 15, testified that he was 10 years old when he first met defendant. He attended defendant's camp three times during 1985 and 1986. In May 1986, he stayed overnight with defendant and T.B. in defendant's van. Defendant slept between them. They all slept with no clothes on.

On each of the four or five nights in May that he, T.B. and defendant spent the night in the van, defendant placed his mouth on

his penis and on T.B.'s penis. V.T. explained that he did not tell Detective Carr about these incidents the night he and defendant went to the police station because defendant had told him not to tell because defendant would get in trouble. Later, on February 7, 1987, defendant told V.T. and T.B. not to say anything because he would be arrested and they would get in trouble. V.T.'s mother testified that V.T. stayed overnight with defendant in his van on three or four weekends in May 1986.

Agent James Turner of the Illinois State Police testified that on April 14, 1987, V.T. told him that a white male placed his mouth on V.T.'s penis on three or four occasions during May 1986. On that same date, T.B. told him that a white male placed his mouth on T.B.'s penis on four weekend nights in May 1986.

Defendant testified on his own behalf. He denied having any sexual contact with either T.B. or V.T., including during the month of May 1986. He also testified that he was not in Du Page County on any of the dates alleged in the indictment charging him with aggravated criminal sexual assault of T.B. Defendant presented no other witnesses in his defense.

In rebuttal, V.T. identified the two books, *Games of Summer* and *Pre-Teen Sex*, as books he saw in defendant's van during the month of May 1986. Both books were admitted into evidence in rebuttal.

On February 23, 1989, the jury found defendant guilty on all five counts of aggravated criminal sexual assault. Defendant's attorney filed a motion for a new trial, and defendant also filed a *pro se* motion for a new trial. At a proceeding thereon, the court held defendant in contempt for throwing an envelope at the judge. Defendant was sentenced to five months in jail, and this court affirmed. (See *People v. Taggart* (2d Dist. September 10, 1991), No. 2—89—0575 (unpublished order under Supreme Court Rule 23).) The following colloquy also occurred at the hearing.

"MR. TAGGART: *** a comment?

First of all, the decision for Mr. Brucar to take the case was not mine. The decision was your Honor's.

I stated after the discussion that if I was allowed to proceed, I would proceed on the same course that I had been doing. I think I have a legal right to utilize every legal method that I can to protect myself.

Mr. Brucar had informed [me] that he had intended not to protect me at all. Mr. Brucar had intended, had informed me on numerous ocassions [sic] that he thought I was guilty. I am

innocent. I wasn't in the State. Your Honor knows that. The Prosecution knows that. Mr. Brucar knows that.

MR. BRUCAR [Defense attorney]: Your Honor, I would ask the Court to caution Mr. Taggart that if he is going to get into conversations between himself and me and break the attorney-client privilege, that he may very well find that if I have to state what the conversations were, they would be incriminating statements that would come out to protect the record and that is not what I want to do.

I find this putting me in a very awkward position and I won't be put in that position.

MR. TAGGART: Nothing incriminating now than what was before. I was not in the county when the crime would have occurred."

On April 14, 1989, the court denied both post-trial motions and conducted a sentencing hearing. A former student of defendant's testified that he observed defendant paddle boys while fondling their genitals. Another former student testified that defendant once touched his genital area in the shower. An 11-year-old boy who attended defendant's camp when he was six years old testified that defendant touched his bare buttocks on one occasion and touched his penis on two other occasions.

Additionally, the State introduced other books recovered from defendant's home which dealt with homosexuality and boys. Agent Robert Fortner of the Tennessee Bureau of Investigation testified to circumstances that provided the basis of felony charges to which defendant pleaded guilty in Tennessee in 1968. According to Fortner, a boy told him that defendant placed his mouth on his penis, and the boy observed defendant place a broomstick in another boy's rectum. The other boy told Fortner that defendant did place a broomstick in his rectum. A third boy told Fortner that defendant put his mouth on the boy's penis while on a camping trip.

Defendant made a statement in his own behalf but called no other witnesses in mitigation. The court sentenced defendant to 30 years on the four counts involving T.B. and a consecutive sentence of 15 years on the count involving V.T. Defendant filed a timely notice of appeal.

THE STOP

The first issue we address is whether the police had a sufficient basis to make the initial stop of defendant's vehicle. The State responds initially that the police contact with defendant wherein defendant stopped his van, exited, and gave Officer Nicholas his driver's li-

cense did not constitute a stop. Alternatively, the State maintains that if there was a stop it was justified under the circumstances.

We begin by noting that a trial court's ruling on a motion to suppress evidence will not be disturbed unless it is manifestly erroneous. (*People v. Galvin* (1989), 127 Ill. 2d 153, 162-63.) Furthermore, it is the function of the trial court on a motion to suppress to determine the credibility of the witnesses, the weight to be given to their testimony and the inferences to be drawn from the evidence. *Galvin*, 127 Ill. 2d at 163.

Initially, we must determine at what point, if any, defendant was seized because absent a seizure the fourth amendment was not implicated. (See *Florida v. Royer* (1983), 460 U.S. 491, 497-98, 75 L. Ed. 2d 229, 236, 103 S. Ct. 1319, 1324; *United States v. Mendenhall* (1980), 446 U.S. 544, 552-53, 64 L. Ed. 2d 497, 508-09, 100 S. Ct. 1870, 1876; *People v. Long* (1983), 99 Ill. 2d 219, 229.) A person is seized within the meaning of the fourth amendment only when, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. (*Royer*, 460 U.S. at 501-02, 75 L. Ed. 2d at 239, 103 S. Ct. at 1326; *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877.) The fourth amendment is not implicated where the police merely approach an individual in a public place and ask him if he is willing to answer questions or put questions to him if the person is willing to listen. (*Royer*, 460 U.S. at 497, 75 L. Ed. 2d at 236, 103 S. Ct. at 1324.) The fact that a police officer identifies himself as such does not, without more, convert the encounter into a seizure. (*Royer*, 460 U.S. at 497, 75 L. Ed. 2d at 236, 103 S. Ct. at 1324.) Examples of circumstances which might indicate a seizure would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the citizen or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. (*Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877.) These are only examples, however, and an examination of all the relevant circumstances is necessary to determine whether a person reasonably believed he was free to go.

■ In this case, we believe defendant was stopped at the point at which Officer Nicholas asked him to remain near the squad car while Nicholas conversed with V.T. Prior to that point, defendant would have reasonably believed he was free to go. While driving his squad car into a position behind defendant's van, the officer did not signal defendant to stop his van, nor did the officer exhibit a show of authority. (See *Long*, 99 Ill. 2d at 229-31.) Although he activated the

spotlight on his squad car, he did not testify as to how he did so. Additionally, while stating he observed the squad car behind him, defendant did not testify that he saw the spotlight or that it caused him to stop his van. Moreover, the shining of the spotlight, without more, did not constitute a stop. See *People v. Holdman* (1978), 73 Ill. 2d 213, 220-21.

After observing the squad car behind him, defendant stopped the van, exited and approached the officer. According to defendant, he removed his driver's license from his wallet as he approached Officer Nicholas and handed him the license. He denied that the officer asked him to see his driver's license. Officer Nicholas, on the other hand, testified that he asked defendant for identification. The mere exiting of his vehicle, without police prompting, did not rise to the level of a seizure. Nor did defendant's voluntary offering of his driver's license constitute a stop, notwithstanding the officer's contemporaneous request for identification.

Upon asking for identification, Nicholas explained to defendant that his van fit the description of a reported suspicious vehicle. He also took possession of defendant's driver's license. He then asked defendant to remain near the squad car as Nicholas approached defendant's van. These circumstances lead us to conclude that defendant was seized at the point Nicholas asked him to remain near his squad car. A person would not reasonably believe he was free to go where a police officer told him his vehicle looked like a reported suspicious vehicle, held his driver's license and asked him to remain in a particular location while he approached the person's vehicle.

The next question then is whether the officer had a reasonable suspicion to stop defendant for investigatory purposes. (See *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868.) Specific and articulable facts, and not a mere hunch, must exist to justify a *Terry* stop. (*Terry*, 392 U.S. at 27, 20 L. Ed. 2d at 909, 88 S. Ct. at 1883.) These principles are codified in our Code of Criminal Procedure of 1963. Ill. Rev. Stat. 1989, ch. 38, par. 107—14; *People v. Long* (1983), 99 Ill. 2d 219, 228.

Here, Officer Nicholas received a radio dispatch of a suspicious, dark colored van in a parking lot shortly after midnight. An officer may rely on information received through police communication channels, including radio, along with other circumstances to support a reasonable suspicion to conduct a *Terry* stop. (See *Village of Gurnee v. Gross* (1988), 174 Ill. App. 3d 66, 69.) As he entered the lot, he observed a dark colored van sitting in the lot with no lights on. While defendant testified the van did not move after the squad car entered

the lot, the trial court apparently resolved this conflict in favor of the State (see *Galvin*, 127 Ill. 2d at 163) as it found that the van was "moving toward the highway" at the time it stopped. Under these circumstances, it was reasonable for Officer Nicholas temporarily to detain defendant for the purpose of investigating his presence in the lot.

Defendant argues, however, that any reasonable suspicion that may have justified Officer Nicholas' detention of him dissipated once he ascertained that defendant had a valid driver's license and vehicle registration. The fact that defendant had a valid driver's license and registration did not, under these circumstances, serve to attenuate Officer Nicholas' otherwise reasonable suspicion to stop defendant's vehicle and temporarily detain defendant. The validity of defendant's driver's license and registration was not the focus of Nicholas' suspicion, and such information did little, if anything, to detract from the suspicious circumstances surrounding the van's presence in the parking lot.

### TRANSPORTATION IN THE SQUAD CAR

■ We turn next to the question of whether the police unlawfully detained defendant when they placed him in the squad car and transported him to the police station. This argument is premised upon the contention that the original detention of defendant was continued by placing defendant into the squad car and driving him to the station and that the reasonable basis for the original stop, if any, had dissipated to the point that there was no longer a lawful basis to detain defendant.

As we have already discussed, the police did have a lawful basis to temporarily detain defendant in the parking lot and that such detention occurred at the time Officer Nicholas asked defendant to remain near his squad car. Under the facts of this case, however, we need not reach the question of the scope and duration of the stop as the stop was effectively terminated. A seizure is a single act and not a continuous fact. (*California v. Hodari D.* (1991), 499 U.S. 621, 625, 113 L. Ed. 2d 690, 697, 111 S. Ct. 1547, 1550.) Furthermore, a temporary detention, by definition, cannot go on indefinitely. A *Terry* stop is no longer a seizure under the fourth amendment at the point an individual reasonably believes he is free to go.

In the present case, while Officer Nicholas may have retained a certain level of suspicion after having talked to defendant and to V.T., it is unnecessary to consider whether that suspicion justified a further detention of defendant because Nicholas relinquished control over defendant in such a manner and under such circumstances that a rea-

sonable person would no longer have believed he was not free to leave. This is so notwithstanding the unlawful search and seizure of the envelope containing the photographs of nude boys under a waterfall. The officer asked defendant, who was sitting in the squad car because of the extreme cold, whether he would mind coming to the police station. He did not inform defendant he was required to go to the station. Defendant, on his own initiative, then asked the officer to secure his van. Upon locking the van's doors, Nicholas returned the keys to defendant. Although defendant was seated in the rear seat of a squad car with doors incapable of being opened from the inside, there is no evidence that defendant ever indicated in any manner to the officers present that he desired to be let out. The evidence fails to support a conclusion that a person in defendant's position would have reasonably believed he was not free to leave at that point.

Furthermore, we note that the mere fact that the police detained V.T. does not compel a conclusion that the police detained defendant absent evidence that the police asked defendant to wait for or accompany V.T. (See *Long*, 99 Ill. 2d at 231.) If defendant opted to wait for V.T. or to accompany him to the station, that does not bear on the constitutional propriety of the officers' conduct. (See *Long*, 99 Ill. 2d at 231.) While here defendant arguably had some responsibility for V.T., the police had taken custody of V.T., a fact that would lead a reasonable person to conclude his continued care of V.T. was no longer needed.

Consequently, the initial *Terry* stop terminated when Officer Nicholas asked defendant if he would mind coming to the station. We need not consider, therefore, whether the police had a lawful basis to detain defendant when they transported him to the station. We view defendant's being transported to the police station as a voluntary act of his own choosing.

### VOLUNTARINESS OF CONSENT

Defendant's next contention is that he was unlawfully detained when placed in the interrogation room and questioned and that the taint of the unlawful arrest was not attenuated sufficiently to render his consent to search voluntary. To determine whether an arrest has occurred, we must consider whether a reasonable person would have considered himself arrested or free to leave, the intent of the officer and the understanding of the arrestee, and whether the defendant was told he was free to leave or that he was under arrest. *People v. Melock* (1992), 149 Ill. 2d 423, 436-37; *People v. Holveck* (1990), 141 Ill. 2d 84, 95.

■ Here, defendant has pointed only to his being taken into an "interrogation" room and being questioned as evidence of his arrest. He refers to no other evidence which would support the contention that he was in police custody at the time he gave his consent to Detective Carr. The mere fact that defendant was taken into an "interrogation" room and questioned, without more, is insufficient to establish that he was under arrest. Detective Carr described the room as having a glass panelled door which was unlocked. Carr told defendant that he was free to go, but defendant indicated he wanted to stay and assist in clearing up the matter. At a later suppression hearing, Carr added that he told defendant he was not in custody. Defendant never voiced any objections to being at the police station, never asked to consult an attorney and never asked to leave until after the police completed their questioning. Carr spoke with defendant concerning his consent for a total of about 20 to 30 minutes. At trial, Carr testified that defendant was extremely cooperative, said he would stay as long as necessary and never asked to leave until the investigation was complete.

Defendant's version was that he was placed alone in an interrogation room for 10 or 15 minutes. One of the uniformed officers questioned him about the negatives taken from his van, and then Detective Carr questioned him. According to defendant, when he asked if he could leave the officers asked if he could afford a lawyer. When he asked for his heart medicine, he was ignored.

As noted earlier, it is the function of the trial court to assess the credibility of witnesses, and its ruling will not be disturbed unless manifestly erroneous. (*Galvin*, 127 Ill. 2d at 162-63.) It is apparent from the trial court's ruling that it accepted the officer's version of events over that of defendant. There is nothing in Detective Carr's testimony that would lead us to conclude that defendant was under arrest prior to giving his consent to the search; therefore, defendant's argument that his consent was invalidated due to an unlawful arrest must fail.

Defendant next contends that even if he was not unlawfully arrested prior to giving his consent such consent was nevertheless involuntary because of the coercive atmosphere at the police station. As evidence of his involuntary consent, defendant relies on the fact that he was transported to the station in a locked police vehicle, that he was not advised of his right to refuse to go with the police and that Detective Carr showed him two photographs of naked boys seized from his van.

The voluntariness of a consent to a police search depends on the totality of the circumstances, and it is the State's burden to show by a preponderance of the evidence that the consent was voluntarily given. (*People v. Casazza* (1991), 144 Ill. 2d 414, 417.) A trial court's determination of the voluntariness of a consent will not be disturbed unless it is clearly unreasonable. *Casazza*, 144 Ill. 2d at 417-18.

In the present case, Carr testified that his initial conversation with defendant at the police station lasted only 15 or 20 minutes and that he asked defendant if he could look in his van and see if there was anything there that might explain why defendant was out at that hour with a young boy. Carr also told defendant he was free to leave and that he did not have to allow the search although it would help the police clear up the matter. Defendant responded that he wanted to stay and assist in clearing up the matter. Carr denied telling defendant that the police possessed evidence of his having committed certain offenses, denied telling defendant that the police would get him help if he confessed, and denied telling defendant he would be given his heart medication if he consented to a search of his van. According to Carr, defendant did not appear ill, did not appear to be under the influence of alcohol or drugs and was understandable. Carr spent only about 20 to 30 minutes with defendant prior to defendant's signing the written consent form. These circumstances readily support a conclusion that defendant's consent was voluntary.

Defendant, however, points to his being locked in the squad car, the failure to be told of his right to refuse to go with the police and Detective Carr's showing him two photographs illegally seized from his van as evidence that his consent was involuntary. Defendant relies on *People v. Shaver* (1979), 77 Ill. App. 3d 709, to support his contention that his being transported in a locked squad car and the failure of the police to tell him he could refuse to go rendered his consent involuntary. *Shaver* is distinguishable from the present case, however, as there the defendant was not only transported in a locked police van but was also handcuffed. (77 Ill. App. 3d at 713.) Moreover, the court considered defendant's being handcuffed and transported in a locked police van in conjunction with the "surroundings at the station" as creating a coercive atmosphere. 77 Ill. App. 3d at 713.

As we have already noted, there was nothing particularly coercive about the events at the police station. Nor was defendant handcuffed. Furthermore, the court in *Shaver* did not expressly state that it considered the failure to advise defendant of his right to refuse to go to the station as determinative of an involuntary consent. Rather, the court merely noted that while an initial request to come to the station

might carry an implication of an obligation unless clearly stated to be a voluntary choice, such a fact does not itself make it impossible for a suspect to consent voluntarily to accompany the police. (77 Ill. App. 3d at 713.) Moreover, in *Shaver* the police told the defendant they "would like to talk to him at the police station" (77 Ill. App. 3d at 710) whereas here they merely asked defendant if he would mind coming to the station.

Defendant further relies on *People v. Freeman* (1984), 121 Ill. App. 3d 1023, for the proposition that Detective Carr's showing of the two photographs of naked boys to defendant prior to signing the written consent rendered such consent involuntary. In *Freeman,* this court held a consent to be involuntary because it was "inextricably bound up with illegal conduct and [could not] be segregated therefrom." (121 Ill. App. 3d at 1032.) There, a homeowner was asked for the keys to her garage following the illegal search of the garage which was located outside the permissible scope of a search warrant.

Here, defendant's consent was not inextricably bound up with the illegal search by Officer Nicholas of defendant's van. In *People v. Kelly* (1979), 76 Ill. App. 3d 80, the case relied on by the *Freeman* court, the court held that "consent is ineffective to justify a search when a search or entry made pursuant to consent immediately following an illegal search, *involving an improper assertion of authority,* is inextricably bound up with illegal conduct and cannot be segregated therefrom." (Emphasis added.) (76 Ill. App. 3d at 86.) The court added that "[s]tated another way, mere acquiescence to apparent authority is not necessarily consent." (76 Ill. App. 3d at 87.) In *Kelly,* an officer improperly asked the defendant to remove a tire tool which was protruding from under the seat of his car. The defendant was then asked for consent to search the vehicle, which he gave. It was the illegal request to have defendant remove the tire tool from his vehicle which led the court to hold that defendant's consent, "being itself the fruit of an *illegal assertion of authority,* [could not] justify a further illegal search." (Emphasis added.) 76 Ill. App. 3d at 87.

We interpret the essence of *Kelly* and *Freeman* to be that a consent obtained pursuant to an unauthorized assertion of police power in such a fashion as to convey to a defendant an apparent authority to so act renders a consent involuntary. Such is not the case here, however. Detective Carr's mere display of the photograph, albeit seized illegally from defendant's van, without more, did not convey an apparent authority such that defendant would have believed his consent to be a passive submission to that authority rather than a voluntary relinquishment of a right. There is nothing in the record to indicate that

the defendant would have felt obliged to consent to a search of his van merely because Carr showed him the two photographs previously taken from the van. While Carr testified that he referred to the two photographs when talking to defendant, he did so to explain why he wanted to search defendant's van. We do not believe this mere reference to the photographs would have communicated an apparent authority to search the van, nor is it otherwise shown how it would have necessarily motivated defendant to give his consent.

### SEIZURE OF EVIDENCE

Defendant next argues that the seizure of the index cards and photographic material from his van was unlawful because at the time they were seized there was no nexus between them and criminal behavior. To seize an item, an officer must have probable cause to believe the item constitutes contraband or evidence of a crime. (*People v. Bibbs* (1988), 176 Ill. App. 3d 521, 523-24; *People v. Brink* (1988), 174 Ill. App. 3d 804, 809-11; see *Illinois v. Andreas* (1983), 463 U.S. 765, 771, 77 L. Ed. 2d 1003, 1010, 103 S. Ct. 3319, 3324.) Probable cause is a flexible, commonsense standard that requires that the facts available to the officer warrant a man of reasonable caution to believe that certain items may be contraband or useful as evidence of a crime. (*Bibbs*, 176 Ill. App. 3d at 523, citing *Texas v. Brown* (1983), 460 U.S. 730, 742, 75 L. Ed. 2d 502, 514, 103 S. Ct. 1535, 1543.) A practical, nontechnical probability that incriminating evidence is involved is all that is required. (*Bibbs*, 176 Ill. App. 3d at 523, citing *Brown*, 460 U.S. at 742, 75 L. Ed. 2d at 514, 103 S. Ct. at 1543.) The evidence thus seized must be seen and weighed not in terms of scholarly analysis but as understood by those versed in the field of law enforcement. *Bibbs*, 176 Ill. App. 3d at 523, citing *Brown*, 460 U.S. at 742, 75 L. Ed. 2d at 514, 103 S. Ct. at 1543.

In this case, while searching the van pursuant to defendant's consent, the police discovered negatives, photographs and index cards containing names and addresses. Several of the negatives depicted naked boys, some of whom were exhibiting their genitalia and anuses. These were observed at a time when the police already knew that defendant was out with a young boy after midnight parked in a parking lot with the lights of his van off and that, upon the approach of the police, the van drove off with its lights out. Furthermore, defendant and the boy told conflicting stories as to where they were going to spend the night. In light of all the information available to the police at the time they viewed the negatives and photographs, it was reasonable for them to believe that they constituted contraband or ev-

idence of a crime, whether it be child pornography or some other sex-related offense.

As to the index cards, while they were innocuous in and of themselves, when viewed along with the photographs and negatives and in light of what the officers already knew, the police had probable cause to believe they constituted evidence of crime or were likely to lead to further evidence. Under these facts and circumstances, the police acted reasonably in seizing the photographs, negatives and index cards from defendant's van.

### REBUTTAL EVIDENCE

We next address defendant's contention that the trial court erred in permitting the prosecution to introduce in rebuttal two books that had been suppressed as being illegally seized. The State may, under certain circumstances, impeach a defendant with suppressed evidence. (*People v. Williams* (1990), 205 Ill. App. 3d 1001, 1005; see *People v. James* (1988), 123 Ill. 2d 523, 529-31, *rev'd on other grounds* (1990), 493 U.S. 307, 107 L. Ed. 2d 676, 110 S. Ct. 648.) A defendant's constitutional shield against having illegally seized evidence used against him may not be " 'perverted into a license to use perjury by way of a defense, free from the risk of confrontation.' " (*Williams*, 205 Ill. App. 3d at 1005, quoting *United States v. Havens* (1980), 446 U.S. 620, 626, 64 L. Ed. 2d 559, 565, 100 S. Ct. 1912, 1916.) The State may not impeach a defendant, however, merely as a subterfuge to place otherwise inadmissible evidence before the jury. *Williams*, 205 Ill. App. 3d at 1005.

In this case, the State introduced two paperback books, *Games of Summer* and *Pre-Teen Sex*, seized from between the mattresses in defendant's van, to rebut defendant's testimony that he had not engaged in sexual contact with either of the victims in this case. Defendant's explanation for the fact that boys who attended his camp were required to go without clothing was that it would teach principles of native American culture and that the practice was unrelated to any sexual interest by him. Without unnecessarily elaborating on the content of each book, *Games of Summer* contains graphic and sexually explicit descriptions of homosexual encounters involving an older male lifeguard with younger males and a camp counselor with younger boys. *Pre-Teen Sex* also contains graphic descriptions of sexual conduct between teachers and young students. V.T. identified these books as being in defendant's van in May 1986.

The material contained in these books was relevant to show defendant's state of mind during the time frame of his alleged sexual

encounters with the two victims. While we recognize that books of a general pornographic nature may not necessarily be proper rebuttal in all cases of a defendant's denial of sexual misconduct, here the books referred to instances of sexual contact between persons in positions of authority and their young underlings. These books were particularly relevant to the allegations of sexual misconduct between defendant and his young subordinates, and they were properly admitted to rebut his direct testimony that he never had sexual contact with either boy.

Defendant further argues, however, that the books should not have been admitted as they indicated merely his propensity to commit a crime. In support of this contention, he cites *People v. Malkiewicz* (1980), 86 Ill. App. 3d 417. *Malkiewicz* is clearly distinguishable from this case, however, as there the State introduced the titles of several books but failed to show their relevance or materiality to the crimes charged or the defendant's state of mind. (*Malkiewicz*, 86 Ill. App. 3d at 422.) The books were introduced solely to suggest to the jury the defendant's propensity to commit the crime. *Malkiewicz*, 86 Ill. App. 3d at 422.

Here, unlike in *Malkiewicz*, the books were relevant to show defendant's state of mind as rebuttal of his denial of having had sex with the victims. Additionally, the books themselves were admitted into evidence, whereas only the titles were admitted in *Malkiewicz*. Thus, in the present case, the relevance of the books is more apparent than it was in *Malkiewicz*. We find no error in the trial court's admission of the two books to rebut defendant's direct testimony. Additionally, in light of the other evidence of defendant's guilt, any error in admitting these books was harmless.

## STANDBY COUNSEL

Defendant further contends that the trial court committed reversible error by prohibiting standby counsel from prompting defendant to make objections. The State responds initially that no error occurred as defendant was not entitled to "hybrid" counsel and because the trial court is empowered to limit standby counsel from prompting objections to maintain the decorum of the court. Alternatively, the State maintains that any error was harmless.

While a defendant has the right under the Federal and State Constitutions to waive counsel and proceed *pro se* (*People v. Gibson* (1990), 136 Ill. 2d 362, 374-75; see *Faretta v. California* (1975), 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525), such right does not carry with it a corresponding right to the assistance of a legal advisor (*Gibson*, 136 Ill. 2d at 383; see *People v. Williams* (1983), 97 Ill. 2d 252,

267). A defendant who chooses to represent himself must do just that. (*Gibson*, 136 Ill. 2d at 383.) Even though a court may appoint standby counsel to assist a defendant who elects to proceed *pro se* (*Gibson*, 136 Ill. 2d at 383; *People v. Partee* (1987), 157 Ill. App. 3d 231, 247; see *Faretta*, 422 U.S. at 834 n.46, 45 L. Ed. 2d at 581 n.46, 95 S. Ct. at 2541 n.46), the decision to do so is a matter of discretion and shall not be disturbed absent an abuse of that discretion (*Gibson*, 136 Ill. 2d at 383; *Partee*, 157 Ill. App. 3d at 247). Relevant criteria appropriately considered by the court in deciding whether to appoint standby counsel include the nature and gravity of the charge, the expected factual and legal complexity of the proceeding and the abilities and experience of the defendant. *Gibson*, 136 Ill. 2d at 380.

■ In this case, the trial court was well within its discretion in appointing standby counsel considering the seriousness of the charge, the extent and nature of the evidence and defendant's minimal experience with the criminal justice system. Defendant does not suggest otherwise. Rather, he contends that the trial court erred in prohibiting standby counsel from prompting him to make objections.

It is just as much a matter of discretion on the part of a trial court in deciding the nature and extent of standby counsel's involvement as it is in determining whether to appoint standby counsel at all. In establishing the parameters of standby counsel's assistance in a particular case, a court must remain aware of the need for standby counsel. The court must also be cognizant of the fact that a defendant is not entitled to a "hybrid trial" in which he alternates between proceeding *pro se* and being represented by counsel. (*People v. Pondexter* (1991), 214 Ill. App. 3d 79, 88; see *McKaskle v. Wiggins* (1984), 465 U.S. 168, 178-84, 79 L. Ed. 2d 122, 133-37, 104 S. Ct. 944, 951-54.) Additionally, a *pro se* defendant is entitled to retain control over the case he wishes to present to the jury, and participation by standby counsel must not be allowed to destroy the jury's perception that the defendant is representing himself. (*Pondexter*, 214 Ill. App. 3d at 88; see *McKaskle*, 465 U.S. at 178, 79 L. Ed. 2d at 133, 104 S. Ct. at 951.) Thus, the proper exercise of discretion in this context requires the balancing of the various interests implicated by a defendant's decision to defend himself.

Here, the court explained to defendant that standby counsel was "not to run the trial," "not to try the issues and not to prompt you by being the attorney." He further advised defendant that defendant assumed the responsibility of making objections and that defendant could ask standby counsel questions if need be. Standby counsel was "not going to be an active force in trying [the] case." Prohibiting

standby counsel from prompting defendant to object was a reasonable limitation placed on his role in light of the court's willingness to allow defendant to ask questions of the attorney when necessary. Such a limitation also avoided the appearance to the jury that defendant was not actually in control of his defense and was not representing himself. Under these circumstances, the trial court properly exercised its discretion by prohibiting standby counsel from prompting defendant to make objections.

### NARRATIVE TESTIMONY

Defendant next contends that he was denied his sixth amendment right to counsel because he was required to testify in narrative form after his attorney was allowed to disassociate himself from defendant's testimony because of unspecified ethical considerations. The State responds that the issue was waived by defendant's failure to object and acquiescence in testifying in narrative form. The State also argues that the record supports the inference that counsel's "ethical considerations" consisted of defendant's intent to perjure himself concerning an alibi defense.

Our recent decision in *People v. Bartee* (1991), 208 Ill. App. 3d 105, is dispositive of this issue. In *Bartee*, defense counsel, during the trial, advised the court that "something happened" between himself and the defendant that required him to withdraw and forbade his placing the defendant on the stand to testify. (208 Ill. App. 3d at 106.) Counsel further stated that he was precluded from telling the court the exact nature of the problem; however, he referred the court to *Nix v. Whiteside* (1986), 475 U.S. 157, 89 L. Ed. 2d 123, 106 S. Ct. 988, and Supreme Court Rules 4—101, 2—110(b) and 7—102 (107 Ill. 2d Rules 4—101, 2—110(b), 7—102). (208 Ill. App. 3d at 106.) The court noted that *Nix* dealt with an attorney's obligations when he knows his client intends to commit perjury. (208 Ill. App. 3d at 106.) The trial court denied the motion to withdraw but ruled that the defendant would testify in narrative form.

In holding that the defendant was not denied a fair trial or the effective assistance of counsel by having to testify in the narrative, this court squarely rejected the "firm factual basis" test proposed in *United States v. Long* (8th Cir. 1988), 857 F.2d 436, for determining whether defense counsel is justified in adopting a belief of impending perjury. (*Bartee*, 208 Ill. App. 3d at 106-08.) We found support for doing so in *People v. Flores* (1989), 128 Ill. 2d 66, which we interpreted as implicitly rejecting the *Long* standard. (208 Ill. App. 3d at 107.) We concluded that *Flores* adopted a less stringent test of a discretionary

good-faith determination by defense counsel that witnesses, including a defendant, will perjure themselves. 208 Ill. App. 3d at 108.

■ In applying that standard in this case, we hold defendant was not denied his sixth amendment right to counsel by being required to testify in the narrative. Prior to defendant's case in chief, his court-appointed counsel expressed a desire to go on the record concerning defendant's alibi defense. In that regard, he stated that he had spoken to between 10 and 15 witnesses for the purpose of establishing defendant's whereabouts on the four dates charged in the indictment pertaining to T.B. According to counsel, all of these witnesses stated unequivocally that there was no way they could place defendant at any location on those particular dates.

Defense counsel also referred to a "Smith family" that defendant suggested as alibi witnesses. A calendar kept by Mrs. Smith had notations that defendant would not have been in Du Page County on one of the four dates charged but would have been present on two of the dates, thereby rendering her testimony arguably detrimental to the defense. Based on his review of the calendar and prior statements made by Justin Smith, defense counsel expressed doubt as to the veracity of the calendar. Concerning another potential alibi witness who said he could testify that defendant was with him in Indiana on May 16, 1986, counsel stated that Justin Smith told him that the witness was not with them on the trip to Indiana. Furthermore, based on his conversation with this witness, defense counsel did not believe that he could base a good alibi defense on the witness' memory. Finally, defense counsel received material from a State park in Indiana which indicated that a receipt defendant possessed dated May 12, 1986, would detract from any possible alibi defense for the dates in question.

According to counsel, everything that he investigated pertaining to defendant's alibi defense was a "dead-end." In his opinion, the "few strands" that would arguably relate to an alibi defense would have been more damaging to defendant's case than helpful. He added that he wanted to make it clear for the record that even though he tried he did not have an alibi defense and would not be presenting any alibi witnesses.

When defendant indicated he would take the stand, defense counsel stated that based on his conversations with defendant in preparing the case, if defendant took the stand he would only ask him his name and ask him to tell his version of the events in the case. Because of "ethical considerations," he would be precluded from asking defendant anything else. The court then asked defendant if he had any problems with that approach, to which defendant responded "no."

While defense counsel did not expressly state that his refusal to conduct a direct examination of defendant was based on defendant's intent to testify falsely, the fact that he did so for "ethical considerations" combined with his explanation of why he believed there was no basis for an alibi defense created a reasonable inference that his refusal was based on his belief that defendant was going to lie about the alibi. Such evidence supports defense counsel's good-faith determination that defendant was going to commit perjury. This is so notwithstanding defense counsel's failure to use the word "perjure." The fact that defense counsel went to great lengths to describe his investigation of the alibi defense and the resulting lack of support for such a defense and also refused to conduct direct examination for "ethical considerations" perhaps better evidences defense counsel's perception that defendant would lie than if he had merely stated a conclusion that he believed defendant would commit perjury. In these types of cases, it is important to identify on the record the basis for counsel's belief so a proper determination of its reasonableness can be made. Defense counsel's belief was reasonable based on this record.

Moreover, defendant has failed to explain specifically how he was materially prejudiced by having testified in a narrative form, a procedure in which he acquiesced at trial. We conclude, therefore, that no reversible error occurred in this regard.

### SENTENCING

Finally, defendant contends that the trial court abused its discretion in imposing consecutive terms of imprisonment of 30 and 15 years. Specifically, defendant maintains that the total sentence was excessive in light of his age and health.

The trial court's sentencing decision is entitled to great deference and weight, and the sentence will not be disturbed absent an abuse of discretion in imposing the sentence. (*People v. Streit* (1991), 142 Ill. 2d 13, 18-19.) A trial court is in a far better position than an appellate court to fashion an appropriate sentence, and a reviewing court should proceed with great caution and care when reviewing the propriety of a sentence. (*Streit*, 142 Ill. 2d at 19.) A reviewing court must not substitute its judgment for that of a sentencing court merely because it would have weighed the sentencing factors differently. *Streit*, 142 Ill. 2d at 19.

In this case, the trial judge specifically noted that he considered defendant's age in the sentencing decision. While the court did not expressly state how much emphasis was placed on defendant's

age, we find no abuse of discretion based upon defendant's age of 59 at the time of sentencing.

As to defendant's health, the presentence report states that defendant reported that he suffered a heart attack in 1981, that two or three of his heart arteries are completely blocked, that scheduled bypass surgery was not performed because of his incarceration, that his next heart attack may be fatal and that he was taking four different medications for his heart problems. There is no medical or expert evidence, however, to support these statements by defendant concerning his health. Furthermore, there is no evidence to establish that defendant's heart condition would be exacerbated by his being imprisoned for the length of the sentence or that he would not receive adequate medical care while incarcerated. Considering the seriousness of the crimes involved and weighed in the context of defendant's extensive history of pedophilia, we do not consider the trial court's decision to sentence defendant to consecutive sentences of 30 years and 15 years to be an abuse of discretion.

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

INGLIS, P.J., and DUNN, J., concur.